FILED
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

NOT FOR PUBLICATION*

September 21, 2020

Blaine F. Bates
Clerk

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

_____

| | |
|---|---|
| GEORGE V. CZAPLINSKI, | BAP No. KS-20-011 |
| Debtor. | |
| GEORGE V. CZAPLINSKI, | Bankr. No. 18-21471 |
| Appellant, | Adv. No. 19-06011 |
| | Chapter 7 |
| v. | |
| BANK OF AMERICA, | OPINION |
| Appellee. | |

_____

Appeal from the United States Bankruptcy Court
for the District of Kansas

_____

Before **ROMERO**, Chief Judge, **HALL**, and **TYSON**,** Bankruptcy Judges.

_____

**HALL**, Bankruptcy Judge.

_____

In bankruptcy, the goal is to obtain a discharge of the personal liability associated

with a petitioner's debts. This concept is often over-simplified as "getting rid of" debts.

_____

*     This unpublished opinion may be cited for its persuasive value, but is not
precedential, except under the doctrines of law of the case, claim preclusion, and issue
preclusion.  10th Cir. BAP L.R. 8026-6.
**     Honorable Kimberley H. Tyson, Bankruptcy Judge, United States Bankruptcy
Court for the District of Colorado, sitting by designation.

But obtaining a bankruptcy discharge does not entitle a debtor to wipe the slate clean of enforceable liens against property. In this appeal, the chapter 7 debtor takes issue with the order and judgment of the United States Bankruptcy Court for the District of Kansas, dismissing his complaint challenging the validity and enforceability of a lien against his residence. Finding no error in the Bankruptcy Court's conclusion that the lien is valid and enforceable, we AFFIRM the dismissal.

## I.      Factual Background & Procedural History

George Czaplinski (the "Debtor") resides at 6310 Aberdeen Road, Mission Hills, Kansas (the "Residence"). Capital Federal Savings held a first mortgage against the Residence (the "First Mortgage") when the Debtor and his non-filing spouse executed an equity line of credit agreement in favor of Bank of America, N.A., formerly NationsBank (the "Bank"), on March 24, 2000 (the "Line of Credit"). The Line of Credit extended a $100,000 credit line to the Debtor.[1] The Bank secured the Line of Credit with a second priority mortgage against the Residence (the "Second Mortgage").[2] The Line of Credit provided the Debtor could access credit by writing special checks, withdrawing funds from branch locations or ATMs, making requests for advances by phone, or through overdraft when his primary checking account lacked sufficient funds for a transaction.[3] The Line of Credit had a term of fifteen years unless "blocked, suspended or terminated" by the Debtor's written request.[4]

---

[1]      *Line of Credit* at 2, ¶ 2, in Appellee's App. at 393.
[2]      *Second Mortgage*, *in* Appellee's App. at 399.
[3]      *Line of Credit* at 2, ¶ 4, in Appellee's App. at 393.
[4]      *Line of Credit* at 2, ¶3, in Appellee's App. at 393.

2

The Debtor refinanced the obligations secured by the First Mortgage and the Second Mortgage by consolidating the two loans and borrowing $450,000 from the Bank in July 2002 (the "$450,000 Loan"). To secure the $450,000 Loan, the Debtor granted the Bank a mortgage lien also secured by the Residence (the "Third Mortgage").[5] At the July 16, 2002 closing of the $450,000 Loan, the Bank paid off the First Mortgage and paid off the $101,162.73 outstanding balance of the Line of Credit. On the same day, the Bank executed a *Real Estate Subordination Agreement* (the "Subordination Agreement"), subordinating the Second Mortgage to the Third Mortgage.[6]

Between August 8, 2002 and December 20, 2005, the Debtor made draws on the Line of Credit by either requesting funds directly or through overdraft protection advances until the balance reached $100,983.00.[7] Although the account number changed in 2016 due to the Bank's consolidation, the Line of Credit remained active.[8] Thereafter, the Debtor continued to make payments on the Line of Credit, the last of which occurred on August 7, 2017.[9] Account histories for the Line of Credit indicate, as of the date of the Debtor's last payment, he owed $80,240.92.[10]

---

[5]    The record before the Bankruptcy Court does not contain a copy of the Third Mortgage.

[6]    *Subordination Agreement,* in Appellant's App. at 42.

[7]    *Home Loan History Statement,* in Appellee's App. at 445.

[8]    *Notice of Account Number Change*, *in* Appellee's App. at 435.

[9]    *Home Loan History Statement* at 14, *in* Appellee's App. at 457.

[10]    *Id.*, *in* Appellee's App. at 457.

3

On July 19, 2018, the Debtor filed a pro se petition under chapter 7 of the United States Bankruptcy Code.[11] In his bankruptcy case, the Debtor identified a claim of $82,819.00 owed to the Bank and secured by the Residence in *Schedule D: Creditors Who Have Claims Secured by Property*, of his bankruptcy petition.[12] The Debtor later filed a complaint initiating an adversary proceeding against the Bank (the "Complaint") on March 1, 2019. The Complaint alleged the Bank failed to release the Second Mortgage securing the Line of Credit, resulting in damages to the Debtor. The Complaint also challenged the validity, priority, and extent of the lien securing the Line of Credit pursuant to § 544(a).

The Bank filed a motion for summary judgment, asserting it held a valid lien and was not required to release the Second Mortgage. The Debtor filed a cross-motion for summary judgment, arguing the Bank did not properly record the Second Mortgage securing the Line of Credit with the register of deeds. The Bankruptcy Court denied the Debtor's cross-motion for summary judgment, concluding the Bank held an enforceable mortgage securing the Line of Credit.[13] The Bankruptcy Court granted the Bank's motion for summary judgment in part and denied the motion in part.[14] The Bankruptcy Court concluded the Bank was not required to release its lien after the $450,000 Loan

---

[11] All future references to "Bankruptcy Code," "Code," or "§," refer to Title 11 of the United States Code.

[12] Appellee's App. at 159.

[13] *Order Denying Debtor's Motion for Summary Judgment* at 5, in Appellee's App. at 261.

[14] *Order Granting in Part and Denying in Part Bank of America's Motion for Summary Judgment* ("Summary Judgment Order") in Appellee's App. at 247.

transaction.[15] However, the Bankruptcy Court found a genuine issue of material fact existed as to the amount due under the Line of Credit.[16] Accordingly, the adversary proceeding continued to trial.

The Debtor appeared pro se at trial, where he testified[17] he and his wife voluntarily executed the Second Mortgage securing the Line of Credit. The Debtor also testified that, at the July 16, 2002 closing of the $450,000 Loan, a representative of the Bank handed him an account card, which he believed was an unsecured credit card.[18] The Debtor did not produce the card itself, account statements for the alleged credit card, or any other evidence of a credit card.[19] However, the Debtor testified he believed any amounts owed to the Bank were on account of unsecured credit card debt.[20] The Debtor, persistent in this theory, explained his understanding that: (i) the 2002 $450,000 Loan transaction terminated the Line of Credit; and (ii) based on the Subordination Agreement, his liability to the Bank could not exceed $450,000.[21] As a result, the Debtor believed any amounts

---

[15]     *Summary Judgment Order* at 8-9, in Appellee's App. at 254-55.
[16]     *Id.* at 9-10, *in* Appellee's App. at 255-56.
[17]     The Bankruptcy Court did not find "the Debtor's testimony to be credible," in part due to his selective memory focusing only on what the Debtor perceived to be beneficial to him. *Order Denying Plaintiff's Lien Avoidance Claim and Dismissing Complaint* (the "Dismissal Order") at 7, n. 9, *in* Appellee's App. at 383.
[18]     *Tr.* at 25, *in* Appellee's App. at 287.
[19]     *Id.* at 25-26, *in* Appellee's App. at 287-88.
[20]     *Id.* 25, *in* Appellee's App. at 287.
[21]     *Id.* at 11, *in* Appellee's App. at 273.

5

incurred by charges made on the unsecured credit card provided by the Bank at the 2002 closing did not encumber the Residence.[22]

A representative from the Bank testified the card given to the Debtor was likely a debit card associated with the Debtor's primary checking account with the Bank.[23] The Bank's representative also explained the Debtor's checking account included overdraft protection linked to the Line of Credit such that, if the Debtor had insufficient funds for checking account transactions, advances would be made from the Line of Credit to cover those transactions.[24] The Bank's representative presented account histories for the Line of Credit that included advances labeled either as ODP (overdraft protection) transfers or online checking advances.[25]

After the trial's conclusion, the Bankruptcy Court entered the Dismissal Order.[26] In the Dismissal Order, the Bankruptcy Court found the Second Mortgage securing the Line of Credit included a future advance clause stating, "this Mortgage also secures all future advances [Bank] at its discretion may loan to Borrower which references this Mortgage, together with all interest thereon."[27] The Bankruptcy Court concluded, under Kansas law, the Second Mortgage contained an enforceable future advance clause and found the Debtor had not requested termination of the Line of Credit pursuant to its

---

[22]     *Id.* at 18, *in* Appellee's App. at 280.
[23]     *Tr.* at 90-91, *in* Appellee's App. at 352-53.
[24]     *Id.* at 88-89, *in* Appellee's App. at 350-51.
[25]     *Id.* at 84-89, *in* Appellee's App. at 346-51
[26]     Appellant's App. at 66.
[27]     *Dismissal Order* at 8, *in* Appellant's App. at 73.

6

terms.[28] As a result, the Bankruptcy Court held the Bank had no obligation to release the

Second Mortgage securing the Line of Credit when it paid the line down in July 2002.[29]

The Bankruptcy Court also found all the Debtor's draws on the Line of Credit

including those after the $450,000 Loan transaction, were made pursuant to the terms of

the Line of Credit.[30] As such, the Bankruptcy Court held the Bank's claim for

approximately $80,000 is secured by the Second Mortgage against the Residence and

dismissed the Complaint. The Debtor filed a timely notice of appeal of the Dismissal

Order.[31]

## II.      Jurisdiction & Standard of Review

"With the consent of the parties, this Court has jurisdiction to hear timely-filed

appeals from 'final judgments, orders, and decrees' of bankruptcy courts within the Tenth

Circuit."[32] Neither party elected to have this appeal heard by the United States District

Court for the District of Kansas; thus, the parties have consented to our review.

"A 'final decision' generally is one which ends the litigation on the merits and

leaves nothing for the court to do but execute the judgment."[33] An order resolving all

claims asserted in an adversary proceeding is a final order for purposes of 28 U.S.C.

---

[28]      *Id.* at 8-9, *in* Appellant's App. at 73-74.
[29]      *Id.*, *in* Appellant's App. at 73-74.
[30]      *Id.* at 5, *in* Appellant's App. at 70.
[31]      *Notice of Appeal*, *in* Appellant's App. at 77.
[32]      *Straight v. Wyo. Dep't of Trans. (In re Straight)*, 248 B.R. 403, 409 (10th Cir. BAP 2000) (first quoting 28 U.S.C. § 158(a)(1), and then citing 28 U.S.C. § 158(b)(1), (c)(1) and Fed. R. Bankr. P. 8002).
[33]      *Catlin v. United States*, 324 U.S. 229, 233 (1945) (citing *St. Louis I.M. & S.R.R. v. S. Express Co.*, 108 U.S. 24, 28 (1883)).

§ 158(a).[34] As the Dismissal Order resolved all of the Debtor's claims under § 544(a), the Court has jurisdiction pursuant to 28 U.S.C. § 158(a).[35]

A determination that a lien may not be avoided pursuant to § 544(a) is a legal question reviewed *de novo*.[36] "*De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision."[37] Any of the Bankruptcy Court's findings of fact considered in forming the basis of its legal conclusions are reviewed for clear error.[38] "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made."[39]

### III.    Discussion

The Debtor's argument is succinct. He contends, at the July 2002 closing, proceeds from the $450,000 Loan paid to the Bank satisfied and "closed" the obligation under the Line of Credit. Further, the Bank subordinated the Second Mortgage securing

---

[34]    *Adelman v. Fourth Nat'l Bank & Tr. Co, N.A., of Tulsa (In re Durability, Inc.)*, 893 F.2d 264, 266 (10th Cir. 1990) ("the appropriate 'judicial unit' for application of these [finality] requirements in bankruptcy is not the overall case, but rather the particular adversary proceeding" (citing multiple cases)).
[35]    *Id.*
[36]    *In re Murray*, 506 B.R. 129, 133 (10th Cir. BAP 2014), *aff'd,* 586 F. App'x 477 (10th Cir. 2014) (citing *Pierce v. Underwood*, 487 U.S. 552, 558 (1988)).
[37]    *LTF Real Estate Co. v. Expert S. Tulsa, LLC (In re Expert S. Tulsa, LLC)*, 522 B.R. 634, 643 (10th Cir. BAP 2014) (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991)).
[38]    *Sender v. Nancy Elizabeth R. Heggland Family Tr. (In re Hedged-Invs. Assocs., Inc.)*, 48 F.3d 470, 472 (10th Cir. 1995) (citing *In re Reliance Equities, Inc.*, 966 F.2d 1338, 1340 (10th Cir. 1992)) (stating "court of appeals must not disturb the bankruptcy court's findings of fact unless they are clearly erroneous").
[39]    *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir. 2002) (quoting *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996)).

the Line of Credit to the Third Mortgage securing the $450,000 Loan, and the Subordination Agreement extinguished the lien of the Second Mortgage. The Debtor argues, as a result, the Bank wrongfully failed to release the Second Mortgage securing the Line of Credit after the July 2002 closing. As such, any advances under the Line of Credit that led to liability in excess of $450,000 are unsecured.

Unfortunately, the Debtor is operating under the mistaken beliefs that the Line of Credit was "closed" and the Subordination Agreement terminated the Line of Credit when the evidence in the record before this Court confirms the Line of Credit remained opened and the Second Mortgage securing the Line of Credit remains valid and enforceable.

### a. The Bank was Not Obligated to Release the Mortgage

"Property interests are created and defined by state law."[40] "The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests."[41] Thus, to determine whether the Second Mortgage constitutes a valid and enforceable mortgage on the Residence, the Court must look to Kansas law.[42]

The Supreme Court of Kansas provides that promissory notes and mortgages are contracts between the parties, and the rules of construction applicable to contracts therefore apply.[43] The primary rule of contract construction is that the intent of the parties

---

[40] *Butner v. United States*, 440 U.S. 48, 55 (1979).

[41] *Id.*

[42] *Valley Bank & Tr. Co. v. Spectrum Scan, LLC (In re Tracy Broad. Corp.)*, 696 F.3d 1051, 1060 (10th Cir. 2012).

[43] *First Nat'l Bank & Tr. Co. v. Lygrisse*, 647 P.2d 1268, 1272 (Kan. 1982).

9

must prevail.[44] The Debtor argues the Bank had an obligation to release the Second Mortgage when it received proceeds from the $450,000 Loan in 2002. On the other hand, the Bank points to the future advance clauses in the Line of Credit and the Second Mortgage as trumping any obligation to release the Second Mortgage. The intent of the parties is evident from the Line of Credit and the Second Mortgage. The Line of Credit required the Debtor to notify the Bank in writing if he wanted to suspend or terminate the Line of Credit, something which the Debtor never did.[45] Similarly, the Second Mortgage secures future advances under the Line of Credit and was not to be released until the Line of Credit was closed.[46]

"Future advance clauses are clearly valid and enforceable in the State of Kansas"[47] and are addressed in the Kansas Statutes applicable to real estate mortgages. Specifically, under Kansas law, a real estate mortgage

> may secure future advances and the lien of such mortgage shall attach upon its execution and have priority from time of recording as to all advances made thereunder until such mortgage is released of record: *Provided*, That the lien of such mortgage shall not exceed at any one time the maximum amount stated in the mortgage.[48]

---

[44]   *Mark Twain Kan. City Bank v. Cates*, 810 P.2d 1154, 1161 (Kan. 1991).
[45]   *Line of Credit* at 4, ¶17, in Appellee's App. at 395.
[46]   *Second Mortgage* at 5, in Appellee's App. at 403.
[47]   *Halliburton Co. v. Bd. of Cty. Comm'rs of Jackson Cty.*, 755 P.2d 1344, 1349 (Kan. Ct. App. 1988).
[48]   Kan. Stat. Ann. § 58-2336 (2020).

Kansas law further provides that when a debt is paid in full "and there is no agreement for the making of future advances to be secured by the mortgage, the mortgagee . . . shall enter satisfaction . . . of such mortgage . . . forthwith."[49]

The only interpretation the Court can derive from reading these two statutes in tandem is, where a mortgage contains a valid future advance clause, the mortgagee is not automatically required to release the mortgage upon payment in full. In such a case, the mortgagee must comply with the terms of the instrument allowing for future advances. In this case, the Second Mortgage securing the Line of Credit provides "[u]pon payment of all sums secured by this Mortgage and closing of the Obligation, [the Bank] shall release this Mortgage without charge to Grantor except for any recordation costs."[50] However, the Line of Credit provides "[i]f the Account is not blocked, suspended or terminated," the Debtor may "request Advances for fifteen (15) years from the date of this Agreement."[51] Moreover, to "suspend or terminate" the Line of Credit, the Debtor needed only to notify the Bank of any such request in writing.[52]

The Bank was under no obligation to release the Second Mortgage securing the Line of Credit while the obligation under the Line of Credit remained opened. The language in the Line of Credit is clear: to request termination, the Debtor must provide written notice. The Debtor never provided any evidence of a written request to terminate the Line of Credit. Additionally, the Debtor continued to take advances under the Line of

---

[49]    Kan. Stat. Ann. § 58-2309a(a) (2020).
[50]    *Second Mortgage* at 5, *in* Appellee's App. at 403.
[51]    *Line of Credit* at 2 ¶ 4, *in* Appellee's App. at 393.
[52]    *Id.* at 4 ¶ 17, *in* Appellee's App. at 395.

Credit, repeatedly increasing the balance after the $450,000 Loan transaction. Since the Line of Credit remained opened, the Bank was under no obligation to release the Second Mortgage. Accordingly, the Bankruptcy Court did not err in determining the Bank was not obligated to release the Second Mortgage.

### b. The Line of Credit is Secured by the Residence

Next, the Debtor argues the Bank's Second Mortgage lien in the Residence should be avoided pursuant to § 544(a). Section 544 "afford[s] trustees the power to avoid any transfer or obligation that a hypothetical creditor with an unsatisfied judicial lien on the debtor's property could avoid under relevant state nonbankruptcy law."[53] Although not an issue raised on appeal in this case, individual debtors "may exercise section 544 avoiding powers only in the limited circumstances outlined in section 522(h)."[54]

The Debtor again argues the Residence does not secure any advances made by the Bank under the Line of Credit (i) after the Bank executed the Subordination Agreement, or (ii) for debt exceeding $450,000. However, the Bankruptcy Court's findings of fact establish the existence of a lien securing the Line of Credit and are not clearly erroneous. The Bankruptcy Court found the Debtor and his wife executed the Line of Credit and the Second Mortgage in March 2000. As of July 16, 2002, the Debtor's balance under the

---

[53] *Morris v. St. John Nat'l Bank (In re Haberman)*, 516 F.3d 1207, 1210 (10th Cir. 2008) (citing 11 U.S.C. § 544(a)(1)).

[54] 5 Collier on Bankruptcy ¶ 544.07[3] (16th ed. 2020). Under § 522(h), a "debtor may avoid a transfer of property of the debtor . . . to the extent that the debtor could have exempted such property under subsection (g)(1) . . . if (1) such transfer is avoidable by the trustee under section 544 . . . ; and (2) the trustee does not attempt to avoid such transfer." 11 U.S.C. § 522(h).

Line of Credit was $100,860.87. While the Debtor and his wife refinanced the First Mortgage against the Residence and paid down the Line of Credit balance to zero with the $450,000 Loan, as explained previously, the Bank was not required to release the Second Mortgage because the Debtor did not request that the Line of Credit be blocked, suspended, or terminated. Accordingly, the Line of Credit remained opened for the stated fifteen-year term.

At trial, the Bank provided account statements indicating the Debtor drew on the Line of Credit after July 2002. The Bankruptcy Court found "[t]he evidence that the advances shown on account statements were made under the terms of the [Line of Credit was] unassailable."[55] The Bankruptcy Court noted each advance contained in the account statements described a method of advance, such as "ODP Advance," "electronic advance," or "balance advance."[56] The Debtor acknowledged he had a checking account with the Bank, and such account may have been linked to the Line of Credit for overdraft protection. The account statements themselves reflect advances were made to cover insufficient fund transactions against the Debtor's checking account. And, all advances made by the Bank under the Line of Credit occurred during the fifteen-year term of the Line of Credit. The advances resulted in a balance of $80,240.92 as of August 2017, approximately one year before the bankruptcy petition.

The Debtor testified the Bank provided him with a "credit card," which he believed was unsecured and not linked to the Line of Credit. However, the Debtor

---

[55]     *Dismissal Order* at 5, *in* Appellant's App. at 70.
[56]     *Id*. at 6, Appellant's App. at 71.

produced no evidence of the credit card or any related credit card statements. The Bank's representative testified the card was likely a debit card the Debtor could use to initiate transfers from the Line of Credit. Lacking any evidence to support the Debtor's claims, the Bankruptcy Court rejected his testimony that the advances were charges to an unsecured credit card.

The Debtor's arguments on appeal do not refute any of the factual findings underpinning the Bankruptcy Court's legal conclusion that the Bank's Second Mortgage is valid and enforceable. The Debtor primarily argues the Bankruptcy Court failed to recognize the Subordination Agreement's legal significance, claiming the agreement renders any advances in excess of $450,000 unsecured. The Debtor is mistaken. He is not a party to the Subordination Agreement and derives no benefit from it.[57] Furthermore, the Subordination Agreement is narrow in scope and only serves to reverse the priority of the liens of the Second Mortgage and the Third Mortgage.[58] The Subordination Agreement does not purport to modify, release, or otherwise terminate the Line of Credit or otherwise alter or change the Debtor's obligations under the Line of Credit. In fact, the Subordination Agreement itself is perhaps the best evidence that the parties did not intend the Subordination Agreement to somehow terminate the Line of Credit and consequently require the release of the Second Mortgage. If the Line of Credit terminated, then the

---

[57]     163 Am. Jur. Proof of Facts 3d 305 (2017) ("The subordination agreement will only be between the two creditors whose rights and remedies against the borrower are altered or adjusted according to the terms of the agreement.").
[58]     *Subordination Agreement* at 2, in Appellant App. at 98 ("Subordinator hereby subordinates the Senior Lien to Bank of America's Junior lien.").

14

Second Mortgage would have been required to be released and the Subordination Agreement would serve no purpose.

Considering there is no evidence in the record to support the Debtor's claims, and the Bankruptcy Court's factual findings are supported by evidence in the record, the factual findings are not clearly erroneous. As the Bankruptcy Court's findings of fact support its conclusion that the Bank retained a valid and enforceable lien against the Residence based on the Second Mortgage securing the Line of Credit, the Bankruptcy Court did not err in dismissing the Complaint.

## IV.    Conclusion

The Debtor erroneously believes that the 2002 $450,000 Loan transaction, and the Bank's contemporaneous execution of the Subordination Agreement, terminated the Second Mortgage securing the Line of Credit. Despite his contentions, the Debtor admits the Bank advanced approximately $100,000 in the three years following the $450,000 Loan transaction and fails to present any evidence the advances were not made pursuant to the terms of the Line of Credit. Accordingly, upon determining the Bankruptcy Court correctly concluded the Second Mortgage securing the Line of Credit remains a valid and enforceable mortgage, we AFFIRM its dismissal of the Complaint.

15